Phong Thi DOAN, Appellant,

v.

MEDTRONIC, INC., Respondent.

No. C5–96–1353.

Court of Appeals of Minnesota.

Feb. 25, 1997.

Review Denied May 14, 1997.

Hoang K. Tran, Nguyen Tran Law Office, Minneapolis, for Appellant.

Rebecca Palmer, James F. Hanneman, Maslon, Edelman, Borman, & Brand, P.L.L.P., Minneapolis, for Respondent.

Considered and decided by WILLIS, P.J., and PETERSON and FOLEY,* JJ.

## OPINION

PETERSON, Judge.

In this employment termination case, Phong Thi Doan argues the evidence does not support the district court's findings and those findings do not support the conclusion that she was discharged for nondiscriminatory reasons. Doan also claims the district court abused its discretion in denying her motion to amend her complaint, erred in directing a verdict on her tort claims, and denied her a fair trial by failing to appoint an interpreter sua sponte. We affirm.

## FACTS

Appellant Phong Thi Doan is a woman of Vietnamese descent who came to the United States in 1975. Doan worked for respondent Medtronic, Incorporated, assembling medical devices that are implanted in humans to treat chronic pain.

A lead is one component of the medical device. Medtronic builds two models of leads, number 3487A and number 3888. Both lead models must be built in accordance with exact specifications in a sterile environment. Medtronic warned all lead builders not to damage insulation on the lead wires during lead assembly because such damage could cause the entire device to malfunction. Medtronic required all lead builders to check their own leads for damaged insulation before passing them on as good to the next step of the production process, which was gluing electrodes to the lead wires. Medtronic agreed that no one built perfect leads every time. But Medtronic expected all lead builders to discover and discard leads with damaged insulation before gluing electrodes to the lead wires because the glued electrodes concealed any insulation damage.

Doan's employment was terminated on February 11, 1994. Doan was given a letter stating that the grounds for the termination were that she had built ten 3487A leads with damaged insulation and passed them on as good, that a trained lead builder should not have passed the leads on as good, and that she had failed to meet Medtronic's quality requirements consistently. A white American woman replaced Doan.

Doan sued Medtronic for discrimination and intentional and negligent infliction of emotional distress. Doan's motion for an advisory jury was granted. Doan never asked the court to appoint an interpreter or indicated to the court in any way that difficulty speaking or comprehending the English language was preventing her from understanding the proceedings or obtaining due process of law.

At trial, Doan testified that she first complained to Medtronic about harassment in December 1992 after her trainer, Darlene Uecker, accused her of improperly spacing electrodes on leads. Doan said she told Lea Jones, her supervisor, and Melody Richards, her human resources representative, that she was being harassed and picked on and that Uecker hated her because she was Vietnamese. Doan said that although she later reiterated these complaints, Medtronic did nothing.

Doan said that in February 1994, she again met with Richards and complained about Uecker's harassment but Medtronic did nothing. Doan said she specifically told Richards that in June 1992, her team members called her "Statue of Liberty"; in 1991 or 1992, her

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

team members called her garlic woman or garlic breath; and her team members called other Asians her "homeboys." Doan also said people repeatedly said "excuse me, what did you say" when she was talking, which made her feel that they did not want to understand or talk to her; she was not allowed to learn how to perform final inspections; and she was not allowed to make up time she missed but white employees were allowed to do so. Doan finally said that when she was discharged, she told Richards and her supervisor, Jim Budnicki, about the harassment and discrimination but they refused to discuss these matters.

On cross-examination, Doan agreed she did not testify at her deposition about any of the discriminatory incidents. Doan also agreed she had testified at her deposition that no one at Medtronic ever had made a negative comment to her about being Vietnamese and that she never was harassed at Medtronic except when Uecker accused her of building the defective leads.

Doan testified at trial that she told Uecker that she had not built the damaged leads and that no one else at Medtronic ever asked her whether she had built the defective leads. Doan said her team engineer agreed to let her build five leads for him to demonstrate that she could build good leads. Doan said that although one of the test leads had damaged insulation, she warned the engineer that she thought one lead was bad. Doan said she later disassembled between 10 and 20 leads during her normal spot-checking procedure and discovered several with damaged insulation, but Uecker did nothing to discover who had built these leads. Finally, Doan introduced her time card showing that on the day the defective leads that caused her discharge were built, she was working on 3888 rather than 3487A leads.

Medtronic agreed that Doan's termination letter referred to an incorrect lead model number. Budnicki testified that he wrote the termination letter and that he obtained the lead model number from the team engineer's memorandum summarizing the situation and from conversations with the engineer. The team engineer testified that he obtained the model number from Doan's co-workers and possibly even Doan herself.

But Medtronic's witnesses testified that although the model number in the letter was incorrect, Doan had built ten defective 3888 leads. Uecker testified that she found the damaged 3888 leads at Doan's workstation. Budnicki and Richards testified that when she was discharged, Doan admitted she had built the damaged leads. Budnicki also testified that it took about an hour to build one lead and that team timecards from the day the defective leads were built showed that only Doan had spent more than a fraction of an hour building 3888 leads. Budnicki said the documentation that accompanied each group of leads also showed that ten 3888 leads were scrapped on the day that Doan allegedly built the ten defective 3888 leads and that only two other 3888 leads were scrapped after that date. Budnicki said the time cards and lot documentation showed Doan was the only person on her team who could have built the defective 3888 leads.

The team engineer testified that he expected to receive five good test leads and that Doan never told him that one test lead was bad. The engineer said that when he received one lead with damaged insulation, he concluded that Doan had difficulty building good leads. Other witnesses testified that their primary concern was that Doan had glued electrodes to the damaged leads, thereby indicating that she had passed them on as good despite the damaged insulation.

Budnicki and Richards testified that they reviewed all the documentation regarding the ten defective leads, that Budnicki looked at the damaged test lead, and that they considered Doan's quality problems during 1992. Budnicki and Richards then decided to terminate Doan's employment for building and passing on the damaged leads and for failing to meet Medtronic's quality requirements.

Richards agreed that in 1992, Doan reported that she was being "picked on." Richards, however, said that Doan did not make this comment until after she was told that there was a quality problem with her work. Richards said she therefore attributed Doan's comment to Doan's difficulty in receiving constructive criticism about her work.

Richards said Doan later said that her relationship with Uecker was fine. Richards also testified that Doan did not report any discrimination or harassment during their February 1994 meeting. Budnicki and Richards both denied that Doan said anything about harassment or discrimination when she was discharged.

Doan's evaluations showed her performance was always satisfactory or above average. The evaluations, however, also showed that Doan became defensive when confronted with constructive criticism about her work.

After the parties rested, the trial court said it had had some difficulty understanding Doan's testimony and, consequently, had asked the court reporter to prepare a transcript of Doan's testimony immediately. The court said the transcript showed the court reporter had understood and accurately reported Doan's testimony.

The court granted Medtronic's motion for directed verdicts on Doan's intentional and negligent infliction of emotional distress claims. Doan then moved to amend her complaint to add claims of reprisal discrimination, defamation, and punitive damages. The court denied this motion.

The trial court determined that Doan had established a prima facie case of discrimination and that Medtronic had produced a legitimate, nondiscriminatory reason for its actions. The court then determined that Doan had not met her burden of showing Medtronic's stated reason was not worthy of belief or a pretext for discrimination and concluded that Medtronic had not discriminated against Doan.

The court specifically found that Doan was discharged for building and passing on ten defective leads and that Doan actually had built and passed on the ten defective leads. The court said the incorrect model number in the termination letter was not dispositive in light of the entire record. The court found that Doan did not take criticism well and viewed comments about quality problems with her work as harassment and that Doan's complaints about harassment, therefore, were not based on racial or native origin discrimination. The court also found that

cross-examination severely impeached Doan's testimony regarding the harassing comments directed towards her and that it was more likely than not that these alleged incidents had not occurred. Doan appealed from the judgment.

## ISSUES

I. Does the record support the trial court's findings and do the findings support the court's conclusions on Doan's discrimination claim?

II. Did the trial court abuse its discretion in denying Doan's motion to amend her complaint?

III. Did the trial court err in directing a verdict?

IV. Did the trial court err in failing to appoint an interpreter sua sponte?

## ANALYSIS

### I.

■ When a party appeals from a judgment without having made a motion for a new trial,

"the only questions for review are whether the evidence sustains the findings of fact and whether such findings sustain the conclusions of law and the judgment."

*Novack v. Northwest Airlines, Inc.,* 525 N.W.2d 592, 596 (Minn.App.1995) (quoting *Gruenhagen v. Larson,* 310 Minn. 454, 458, 246 N.W.2d 565, 569 (1976)).

Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

Minn. R. Civ. P. 52.01.

■ An employer cannot discriminate against an employee on the basis of race or national origin. Minn.Stat. § 363.03, subd. 1(2) (Supp.1993). To evaluate a discrimination claim, a court must conduct a three-part analysis: the court first determines whether the plaintiff has established a prima facie case of discrimination; the court then must decide whether the defendant has met its

burden of production to present evidence of a legitimate, nondiscriminatory reason for its acts; and the court finally must determine whether the plaintiff has shown that the employer's proffered reasons were actually a pretext for discrimination. *Hasnudeen v. Onan Corp.*, 552 N.W.2d 555, 556 (Minn. 1996); *see also Feges v. Perkins Restaurants, Inc.*, 483 N.W.2d 701, 711 (Minn.1992) (third prong of *McDonnell Douglas* test requires plaintiff to show proffered reason was pretext for discrimination or not worthy of belief).

> [W]ith regard to the third prong of the test, the sole question is "whether or not the court is persuaded that the employee has been the victim of intentional discrimination."

*Hasnudeen*, 552 N.W.2d at 557 (quoting *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 626 (Minn.1988)).

█ Doan first argues that the trial court should have adopted the advisory jury's findings. But a discrimination case brought under the Human Rights Act is determined by the court. Minn.Stat. § 363.14, subd. 2 (1994). An advisory jury's findings are advisory only and " 'are merely to reinforce the court's own decision on the disputed facts—not to supplant it.' " *Pedro v. Pedro*, 463 N.W.2d 285, 288 (Minn.App.1990) (quoting *In re Estate of Murphy*, 269 Minn. 393, 404, 131 N.W.2d 220, 227 (1964)), *review denied* (Minn. Jan. 24, 1991). The trial court was not required to adopt the advisory jury's findings and, in fact, was required to make its own findings. The fact that the trial court disbelieved testimony believed by the jury does not make its findings clearly erroneous or unsupported by the record.

█ Doan next argues the trial court's findings on the third prong of the *McDonnell Douglas* test were not supported by the evidence. We disagree. Evidence in the record showed that the damaged leads were found at Doan's work station. Richards and Budnicki testified that Doan admitted at the termination meeting that she built the defective leads. Although an incorrect model number was stated in the termination letter, testimony at trial explained how this mistake was made and supported the court's finding that, regardless of the model number, Doan had built and passed on ten defective leads.

Further, Doan's failure to testify about the discriminatory and harassing incidents until trial supported the trial court's conclusion that these remarks probably were never made. Similarly, the evidence showing Doan had a history of responding to constructive criticism in a defensive manner, particularly evidence that she complained about harassment after her work was criticized, supported the court's finding that Doan's complaints to Medtronic did not concern racial or national origin harassment. Finally, although Doan claims the trial court disregarded her testimony because it did not understand her, the court's request for and use of an immediate transcript showed it did not disregard her testimony. Doan does not claim that the transcript incorrectly reported her testimony. Overall, the evidence in the record supported the trial court's findings.

The trial court's findings also supported its conclusion that Medtronic did not discharge Doan for discriminatory reasons. The court found that Doan built ten defective leads; that Medtronic's reliance on this quality breach in discharging Doan was justified; that many of the discriminatory comments and incidents alleged by Doan did not occur; and that Doan never reported any harassment to anyone at Medtronic. These findings supported the conclusion that Medtronic's stated reason for Doan's discharge was not a pretext for discrimination or unworthy of belief.

## II.

█ Doan next argues the trial court abused its discretion in denying her motion to amend her complaint to add reprisal, defamation, and punitive damages claims.

> [M]atters such as trial procedure, evidentiary rulings and jury instructions are subject to appellate review only if there has been a motion for a new trial in which such matters have been assigned as error.

*Sauter v. Wasemiller*, 389 N.W.2d 200, 201 (Minn.1986). The decision whether to allow an amendment to a pleading is a matter of trial procedure. *Kulkay v. Allied Cent.*

*Stores, Inc.*, 398 N.W.2d 573, 578–79 (Minn. App.1986), *review denied* (Minn. Feb. 13, 1987), *disagreed with on other grounds by Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826, 841 n. 17 (Minn.1988). Because Doan made no motion for a new trial, we will not address her claim that the trial court erred in denying her motion to amend her complaint.

### III.

Doan next argues the trial court erred in directing verdicts for Medtronic on her negligence claims. Doan's failure to move for a new trial does not preclude our review of the directed verdict. *See Kulkay*, 398 N.W.2d at 579 (when party failed to move for new trial, this court reviewed directed verdict but refused to address issues of trial procedure); *Pedersen v. United Servs. Auto. Ass'n*, 383 N.W.2d 427, 430–431 (Minn.App.1986) (when party failed to move for new trial, this court held that issues of trial procedure had not been preserved for review and then reviewed propriety of directed verdict); *cf. Hagel v. Schoenbauer*, 532 N.W.2d 255, 256–57 (Minn.App.1995) (denial of negligence per se claim reviewable despite absence of posttrial motion because party's challenge to denial was similar to appeal from adverse judgment; party was seeking reversal rather than new trial; and trial court had reconsidered its decision during trial).

A motion for a directed verdict presents a question of law on whether the evidence is sufficient to create a fact issue for the jury to decide. A directed verdict is appropriate only in the clearest of cases where but one conclusion can be drawn from the facts, and the question for determination becomes a question of law for the court.

*Beck v. American Sharecom, Inc.*, 514 N.W.2d 584, 587 (Minn.App.1994) (citations omitted), *review denied* (Minn. June 29, 1994). In reviewing the directed verdict, we "must accept as true the evidence favorable to the adverse party and all reasonable inferences which can be drawn from that evidence." *Claflin v. Commercial State Bank*, 487 N.W.2d 242, 247 (Minn.App.1992), *review denied* (Minn. Aug. 4, 1992).

### A. Intentional infliction of emotional distress.

Intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct (2) that is intentional or reckless and (3) causes emotional distress (4) that is severe. *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438–39 (Minn. 1983). The conduct complained of "must be 'so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community.'" *Id.* at 439 (quoting *Haagenson v. National Farmers Union Property & Cas. Co.*, 277 N.W.2d 648, 652 n. 3 (Minn.1979)).

Here, Doan argues that Medtronic's false accusation that she built the defective leads, her resulting discharge without proper evaluation, the false termination notice, and the false accusation that she disassembled 37 leads was outrageous conduct. We disagree. Even if we view the evidence in the light most favorable to Doan and assume all accusations against her were false, Medtronic's conduct still was not "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Haagenson*, 277 N.W.2d at 652 n. 3. Accordingly, the trial court did not err in directing a verdict on this claim.

### B. Negligent infliction of emotional distress.

To recover for negligent infliction of emotional distress, a plaintiff must show she was within a zone of danger of physical impact, reasonably feared for her safety, and consequently suffered severe emotional distress with resulting physical injury. *Bohdan v. Alltool Mfg. Co.*, 411 N.W.2d 902, 907 (Minn.App.1987), *review denied* (Minn. Nov. 13, 1987).

An exception to the "zone of danger" rule is that a plaintiff may recover damages for mental anguish or suffering for a direct invasion of his rights, such as defamation, malicious prosecution. or other willful, wanton or malicious conduct.

*Id.*

Doan does not seek to recover under the zone of danger test but instead argues

that Medtronic's actions were a direct invasion of her rights and therefore support her negligence claim. But Doan had no valid defamation or other tort claim involving a direct invasion of her rights. Thus, the trial court properly granted a directed verdict on her negligent infliction of emotional distress claim. *See id.* (plaintiff could assert negligent infliction of emotional distress claim if her defamation action stood); *see also Oslin v. State*, 543 N.W.2d 408, 413–14, 417 (Minn. App.1996) (when defamation and battery claims against employer were dismissed because the conduct was not work related, negligent infliction of emotional distress claim also failed), *review denied* (Minn. Apr. 1, 1996).

Given our decision, we need not address the other grounds raised by Medtronic as support for the directed verdicts.

## IV.

 Doan argues that although she never asked for an interpreter or indicated to the trial court that difficulty speaking or comprehending the English language was preventing her from understanding the proceedings or obtaining due process of law, the court should have appointed an interpreter for her sua sponte. In a civil case where the party is handicapped in communication, the trial court "shall appoint a qualified interpreter to serve throughout the proceedings." Minn. Stat. § 546.43, subd. 1 (1996). A person handicapped in communication is one who

> because of difficulty in speaking or comprehending the English language, is unable to fully understand the proceedings in which the person is required to participate, or when named as a party to a legal proceeding, is unable by reason of the deficiency to obtain due process of law.

Minn.Stat. § 546.42 (1996).

Medtronic argues that this court should not consider this issue because (1) Doan did not raise it before the trial court and (2) it is a matter of trial procedure not raised in a posttrial motion. We agree that Doan's failure to raise this issue before the trial court precludes our review of the matter. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (appellate court will address only issues presented to and considered by district court in deciding matter).

## DECISION

The evidence supports the trial court's findings and those findings support the court's conclusion that Medtronic did not discriminate against Doan. We will not consider whether the trial court abused its discretion in denying Doan's motion to amend her complaint because this is an issue of trial procedure that was not raised in a posttrial motion. The trial court did not err in directing a verdict on Doan's tort claims because the evidence, when viewed in the light most favorable to Doan, was not sufficient to create a fact issue for the jury on these claims. We will not determine whether the trial court erred in failing to appoint an interpreter sua sponte because Doan did not raise this issue before the trial court.

**Affirmed.**